**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

FRANCIS SCHAEFFER COX,
16179006
U.S. Penitentiary CMU
P.O. Box 1000
Marion, IL 62959

              Plaintiff,

v.

BENBELLA BOOKS, INC.,
10440 North Central Expressway, Suite 800
Dallas, TX 75231

and

WILLIAM FULTON,
In Witness Protection
c/o 10440 North Central Expressway, Suite 800
Dallas, TX 75231

              Defendants.

**CIVIL ACTION COMPLAINT**

## I.    INTRODUCTION

Plaintiff Francis Schaeffer Cox ("Schaeffer Cox") or ("Plaintiff"), by counsel, sues Defendants Benbella Books, Inc. ("Benbella") and William Fulton ("Fulton") acting in concert, jointly and severally, in this civil action for general defamation, defamation per se, defamation by implication, intentional infliction of emotional distress, and misappropriation of name or likeness, as a result of Defendants causing actual damages, compensatory damages, and giving rise to punitive damages, including continuing and aggravated harm to Plaintiff's professional, business and personal reputation and livelihood. As grounds therefore, Plaintiff alleges as follows:

## II.     JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) in that this is a district in which one of the defendants is subject to the court's personal jurisdiction with respect to this action.

## III.    PARTIES

3.      Plaintiff Schaeffer Cox is an individual, natural person who is a citizen of the state of Alaska. He is currently incarcerated in the Communications Management Unit at the Federal Correctional Institution in Terre Haute, Indiana.

4.      Defendant Benbella is a publishing company and its headquarters  and publishing operation are located at 10440 North Central Expressway, Suite 800 in Dallas, Texas 75231. It published the false, defamatory and misleading book titled "The Blood of Patriots: How I Took Down An Anti-Government Militia with Beer, Bounty Hunting, and Badassery" in 2017.

5.      Defendant Fulton is an individual, natural person who on information and belief is a citizen of Georgia, Texas or another state which is not Alaska, as he has been placed in federal witness protection, given a false identity and relocated outside of Alaska.  He published his false, defamatory and misleading and malicious and reckless  book titled "The Blood of Patriots: How I Took Down An Anti-Government Militia with Beer, Bounty Hunting, and Badassery" in 2017, acting in concert with Defendant Bebella.   This book was and continues to be widely published in this district, throughout the nation and internationally.

## IV.    STANDING

6.     Plaintiff Schaeffer Cox has standing to bring this action because he has been directly affected and victimized by the unlawful conduct complained herein. His injuries are proximately related to the conduct of Defendants, each and every one of them acting in concert jointly and severally.

## V.    FACTS

### BACKGROUND FACTS OF SCHAEFFER COX AND THE PUBLICATION OF THE FALSE, DEFAMATORY AND MISLEADING BOOK

7.     Plaintiff Schaeffer Cox is currently a "political prisoner" held in an old and antiquated U.S. maximum security prison known as the Federal Correctional Institution located in Terre Haute, Indiana. Recently, a Christian inmate has been murdered and a Jewish inmate had his throat slit by what is believed to be a radicalized and now "ISIS connected" Muslim situated in the cell block with Plaintiff Cox, a devout Christian whose life is and continues to be in danger due to his unjust incarceration caused in large part by the illegal actions and false testimony of Defendant Fulton. Plaintiff Cox's unjust and illegal conviction remains on appeal, with one count of alleged attempted murder already having been thrown out by the U.S. Court of Appeals for the Ninth Circuit, and the other primarily count of conspiracy to commit murder also under consideration for dismissal. In short, Plaintiff Cox was set up and illegally entrapped as a result of the actions of Defendant Fulton and other informants who presented false testimony at trial. In addition, exculpatory Brady material and other material evidence was illegally withheld by federal prosecutors to wrongfully convict Plaintiff Cox. The undersigned counsel and a Federal Public Defender are legally representing Plaintiff Cox in a number of related cases and matters.

8.     A well-known Second Amendment lobbyist who had won 38% of the vote in a State House election, Plaintiff Cox had unjustly become the subject of an intense Federal Bureau

of Investigation ("FBI") investigation after he angered state and federal authorities by openly uncovering and then accusing them of drug trafficking and child prostitution.

9.     Oil pipeline service company executive, Bill Allen, who had been spared prosecution on multiple counts of sexual abuse of minors in exchange for his 2008 testimony against pro-Second Amendment Alaska Ted Stevens, was among those implicated. "The State Wide Drug Taskforce supplied children for sex to a number of state and federal officials in exchange for those officials cooperation in concealing the ongoing illicit drug trafficking activities of the State Wide Drug Taskforce," Plaintiff said.

10.     Not long after Plaintiff made these public statements, the same departments that Plaintiff accused of corruption sent in numerous provocateurs to try to switch his efforts off of exposing corruption and on to violent vigilante-type actions. Plaintiff, who believes in non-aggression and voluntarism, can be heard on multiple undercover recordings telling the provocateurs, "No, I'm going to pull a Gandhi, NOT a Rambo" and "if we turn violent, people will see us as the bad guys."

11.     Illegally and in a deviation from accepted investigative techniques, the FBI responded to Plaintiff's rejection of their violent proposals by creating a threat to his children that could serve as a motivator.

12.     Working with the Office of Child Services, the FBI filed a child neglect complaint regarding Plaintiff and his wife's one-in-a-half year old son. Because it does not require probable cause, child neglect complaints are an attractive tool for investigators who wish to enter a home, but lack any evidence to support a warrant.

13.     Once Plaintiff was made aware of the "writ of assistance" issued for the seizure of his young son, the FBI dispatched undercover provocateur, Defendant Bill Fulton, to again try to

convince Plaintiff to commit large-spread violence in response to these new developments. Defendant Fulton, acting under the supervision of FBI Special Agent Sandra Klein, pointed out that the child neglect complaint was obviously the corrupt work of Plaintiff's political adversaries in the government, and urged him to commit violence against all officials involved.

14.     When Plaintiff and a friend of his refused Defendant Fulton's violent suggestions a second time, Defendant Fulton flew into a rage, held a hunting knife to Plaintiff's friend's throat, and told him he would "slit his throat open and bleed him out at his feet" if he and Plaintiff did not agree to the proposed mass violence. Plaintiff and his friend refused and escaped never to see Defendant Fulton again.

15.     Suspecting foul play by the FBI and local police, and fearing for their lives from Defendant Fulton, Plaintiff and his wife went to the military police station on Ft. Wainwright for help. Officers there advised Plaintiff that federal agents had come into the station and bragged of how they planned to "fix the [Plaintiff] Schaeffer Cox problem" by "going into his home to take out his son, and shoot Schaeffer Cox in the process."

16.     The military police gave Plaintiff's attorney affidavits to this effect and would later testify to the same under oath.

17.     At FBI Special Agent Klein's direction, Defendant Fulton made a third attempt to get Schaeffer Cox to commit violence on a mass scale. Defendant Fulton did this by issuing a death threat ultimatum and promising to kill Plaintiff himself if he refused the proposal of violence again.

18.     Fearing for their lives, the Cox family packed their bags and headed for Canada. But, the FBI sent another undercover provocateur, J.R. Olson ("Olson"), after them, court documents said. Olson, a self described "drug wholesaler" working under the supervision of FBI

Special Agent Richard Southerland, held the whole Cox family, including a two-year-old boy and a three-week-old baby girl, hostage, against their will in an attic for twenty-one days after sabotaging their vehicle, then using death threats from Defendant Fulton and made up a story about a truck driver to keep them from leaving.

19.     "The government does not dispute the fact that the actions of the provocateurs working under the FBI's supervision did in fact meet the legal definition of first degree kidnapping," said Robert John, the Fairbanks attorney who was able to get all the State charges against Plaintiff thrown out.

20.     On March 10, 2011, Plaintiff was taken from the attic to a deserted industrial lot in Fairbanks where he believed he would meet the "truck driver" Olson had promised. No such truck driver existed. Instead, there was a FBI ambush of out of town agents who did not know Schaeffer Cox was a well respected local political voice with popular support. The Agent's, who had been instructed to shoot Plaintiff on site if he had a weapon, were not advised by the local FBI case agent of Plaintiff's repeated statements about being like Gandhi not Rambo.

21.     FBI Special Agent Richard Southerland supplied Olson with an unregistered, non-traceable pistol and instructed him to "put it in Schaeffer's lap then get under the truck so there will be some thick metal between you and him when the shooting starts." The FBI's plan was interrupted when the owner of the industrial lot happened upon the scene and started asking questions about why men with masks and machine guns were hiding around the corner.

22.     Plaintiff was arrested and put on trial for "conspiracy against the government." The prosecution was led by Assistant U.S. Attorneys ("AUSAs") Steve Skrocki and Joseph Botini, the same people who were held in contempt of court for hiding evidence in several related trials of Alaska political personalities. The audio recording of Plaintiff repeatedly

rejecting violence were hidden from the jury, but are now being made available to the public by Schaefer Cox supporters via YouTube and other means.

23.     Steve Skrocki, who has publicly attacked Plaintiff for his belief in a moral higher law, built his case primarily on the testimony of Defendant Fulton and RJ Olson. But recently released audio recording and email between AUSA Steve Skrocki and his boss, U.S. Attorney Karen Loeffler, now show that Skrocki coached his witnesses to lie, then vouched for those lies in his closing arguments to the jury.

24.     Still others have taken issue with and refused AUSA Skrocki's entire falsified "theory" of the case. "The importance of this case is significant to the whole of humanity," says Larry Pratt, President of Gun Owners of America. He points out that the prosecution conceded that Schaeffer Cox had no actual plans for violence, but convicted him anyway based on Plaintiff's belief that "We the People" may someday have to stand down an out of control government.

25.     Plaintiff Schaeffer Cox, who has been in prison since 2011 and is now 34 years old agrees. "This amounts to sending people to prison for simply believing in the original meaning of the Second Amendment," he says. "If we don't reserve my conviction, it will set a sweeping new precedent allowing for the wholesale round up of those who have not committed any crimes."

26.     Defendant Fulton, acting as an FBI informant, had a motive to maliciously defame Plaintiff because his shocking sexual advances were abruptly refused and spurned by Plaintiff, who is married heterosexual and a devout Christian.  Defendant Fulton harbors extreme malice and hatred toward the Plaintiff Cox, exacerbated with his extreme and demonstrated

narcissism, jealousies and other sexual and psychological problems and perversions, notwithstanding his "proud" history of admitted "badassery" and lawless and criminal behavior.

## THE WRONGFUL CONDUCT OF DEFENDANTS AND THE DEFAMATORY PUBLICATIONS

27.     "The Blood of Patriots: How I Took Down an Anti-Government Militia with Beer, Bounty Hunting, and Badassery" is replete with false, defamatory and misleading statements throughout its 278 pages. Plaintiff sues for (1) defamation, (2) defamation by implication, and (3) defamation per se but each of the defamatory publications do not only soley fit into one of those categories; for example, many of the statements fall within two or even all three categories of defamation. Therefore, each defamatory statement listed below must be considered to apply to all three causes of action for defamation.  Thus, taken as a whole the multitude of false and misleading statements published with malice or reckless disregard for the truth by the Defendants, in concert and jointly and severely, in order to reap large profits by presenting a sensationalized false narrative, comprise the alleged defamation in all of its forms and give rise to the other causes of action in this Complaint. Tellingly the ghost writer of the book, Jeanne Devon and those who have endorsed it, such as Thom Hartmann (see back cover) and who works as an anchor for Vladimir Putin's RT Television, are either ultra-leftists, atheists and/ or communists, who maliciously despise a Christian libertarian-conservative activist such as Plaintiff Cox.  This reveals the vicious and malicious intent of Defendants' publication, as Plaintiff Cox was and is viewed as an enemy of the extreme left and the government which it worships, as opposed to God.

### Defamation

28.     Page 221:

8

- Cox and Barney were disarmed, searched, and cuffed. Pockets were emptied, and Barney was relieved of a white envelope containing $5,000 in hundred-dollar bills and a receipt of withdrawal from the bank.

- "You have no right to do this to me." Cox said. "This is an illegal arrest. I haven't done anything! I need to make a phone call." His face was flushed as they read him his rights, stood him up, and walked him to the squad car. His eyes darted around madly, taking in the scene as though looking at a dream until they came to rest on Olson, who was leaning against the Explorer, talking to an FBI agent and not wearing handcuffs.

29.     These statements concerning the "take down" are false, defamatory and misleading. Plaintiff did not say anything to Olson or anyone else. In fact, Olson was also arrested in order to keep up the ruse.

30.     Page 221:

- "Son of a bitch," Cox said and let out a half-growl of rage and panic. "You are not going to get away with this! You've started it . . . YOU started this. This is all on your head! [Supposedly talking to Olson].

31.     Plaintiff never said anything remotely like this. Indeed, Plaintiff did not know Olson was an informant until much later.

32.     Page 138:

- "Beer?" I [Defendant Fulton] grabbed a Heineken out of the little refrigerator next to the deck.

- "Sure," he said. Zerbe waved me off and shook his head.

- " . . . same realization. But it's not me I'm worried about. It's my family," he [Plaintiff] said as I [Defendant Fulton] popped the bottles open. "The Office of Children's Services wants

to interview Seth – my three-year-old son! They want to come to my house and do it there so they can find something, create some story that we're not fit parents and take him." He took a long drink. "That's how they'll get to me."

33. Plaintiff Schaeffer Cox does not drink and the statement "[h]e took a long drink" is false and defamatory.

34. Page 138:

- It may be the Heineken, but he looked like he was seeing something play out in front of his eyes – like he was watching the movie of how this was going to go, which was showing on a screen somewhere in the middle distance.

35. Plaintiff Schaeffer Cox does not drink. The statement "[i]t may be the Heineken, but . . ." strongly implies that Plaintiff drinks and drinks so much that his thoughts are impaired.

36. Page 139:

"The Tea Party and the Libertarians are great, and God bless 'em," Cox went on, "but what we need is not a third political party, it's a second government. And if we can't take down this one outright, then it needs to be replaced one branch at a time, beginning with the judicial."

37. Plaintiff did not say this.

38. Page 197:

And then, Vernon brought up Schaeffer Cox's plan to kill judges. I had hoped that plan was ancient history, but I was wrong.

- "So, Schaeffer's thinking this: If we cut the main electrical lines to a house, then the target is gonna come out to see what's going on, right? And then that's when we snipe him. If we've got a suppressor, then nobody's gonna pay no attention, right, because even if you hear it,

it don't sound like a shot and then, we torch the place. Boards across the doors and windows, real fast, and torch it."

39.     Plaintiff did not say this.

40.     <u>Page 155</u>:

- "Where the hell is Schaeffer? I walked up to Zerbe, who instantly got flushed.

- "He's talking with his lawyer," he mumbled, eyes daring around the room, taking in the scene.

- "His lawyer? Why the fuck is he talking to his lawyer?" I didn't wait for an answer. "You were in the same room I was last night, and that was supposedly all over, remember?" I started counting on my fingers, "The Revolution's coming, I need you to serve warrants, we're going to arrest people, can you bring guys up here . . . So, what the hell is he back meeting with his lawyer for? That doesn't sound like the conversation we had last night."

- There was a plan now, goddamn it. And Cox was going to pull one of his famous 180-degree turnarounds? Not again. Not this time.

41.     Plaintiff did not attend the meeting altogether. It was not one of Cox's "180-degree turnarounds, but Fulton's false story.

**<u>Defamation by Implication</u>**

42.     <u>Page 188</u>:

- "Thing is, Schaeffer's looking to buy some pineapple grenades and thought maybe you might be able to get your hands on some. They ain't easy to come by, you know what I mean?"

43.     The "pineapple grenades" were not real grenades. Vernon asked for souvenir replicas of pineapple grenades, which sell well at gun shows and are not illegal.

44.     Defendants knew that the grenades at issue were legal, fake replicas but instead painted a picture which strongly implied that the grenades "ain't easy to come by" and are illegal.

45.     <u>Page 193</u>:

- "Power comes from the barrel of a gun." – Mao Zedong, Jim Jones, and Schaeffer Cox.

46.     Defendants attribute this statement to a (1) brutish, ideological tyrant under whose reign 40 to 70 million people died, (2) a self-proclaimed messiah, cult leader and mass murderer responsible for killing almost 1,000 people, and (3) Plaintiff.

47.     Plaintiff admits to saying this statement but only to point out the evil of people who live by the "might makes right" concept.

48.     By attributing it to him in such a way, Defendants imply that Plaintiff believes the statement and lives by it.

49.     <u>Pages 198-199</u>:

- "You can get these pistols and the suppressors legally, you know," I [Defendant Fulton] pointed out. "You're fucked with the grenades, but you can actually get the others without breaking the law."

- "Yeah, legally *if* you get a tax stamp, and *if* you pay $200 to the goddamn feds, and *if* you apply with Alcohol Tobacco and Firearms, and if they take your fingerprints, and you tell 'em where you live. No, thanks. These ain't for moose hunting," said Vernon.

- These guys [Plaintiff and Vernon] would rather commit a felony that could send them to prison for a decade than have to pay a fee to the government and fill out a form.

50.     Plaintiff had no reason not to pay the $200 tax stamp and in fact went to Alcohol Tobacco and Firearms to attempt to pay it.

51.   Page 200:

After the call, the setup was complete. Specific illegal weapons had been ordered, these idiots knew that what they wanted was illegal and didn't give a shit, I [Defendant Fulton] gave them an opportunity to back out, which they didn't take, and Schaeffer Cox had given his blessing. The agents and the US attorney in the next room had gotten it all on video. And nobody got shot through the wall. It was a good day.

52.   Again, Defendants knew that the "illegal weapons" at issue were legal, fake replicas of pineapple grenades but instead painted a picture which strongly implied that the "illegal weapons had been ordered" and "[Plaintiff] didn't give a shit."

**Defamation Per Se**

53.   Page 140:

- "Well, I was wondering," he [Plaintiff] paused, "if you could do that for me."

- "Do what, arrest people? For you? Who do you want me to arrest?"

- "Traitors, Tyrants," he [Plaintiff] said. "Bad guys. The ones who are part of the problem and have proven by their actions that they are enemies of freedom."

- He [Plaintiff] started listing names – a judge who ruled against him, Fairbanks cops who had harassed friends of his for driving without a license, state troopers, a TSA agent, and of course employees of the Office of Children's Services.

- This could not be real. This had to be the FBI fucking with me. Somehow.

- "So, I [Defendant Fulton] arrest them, and deliver them to who? You? Then what happens to them?

- "They will be tried for their crimes – crimes against natural law, against God's law, and against this country. They will be tried in a Common Law Court, and depending on the severity of their crimes, they'll be fined or hung."

54.     Plaintiff never said any of this and did not come up with a criminal plan that night. Plaintiff told Defendant Fulton that his plan was to have Robert John, Plaintiff's lawyer at the time, work out the problems with Office of Children's Services and that is precisely what occurred.

55.     Page 207:

When Schaeffer Cox returned my message in a panic, saying that he had to have the "supplies" faster than the twelve weeks we agreed to, I called Sandy. I told her he wanted them as soon as possible. It was urgent.

56.     Plaintiff never called Defendant Fulton or said he needed anything "faster." In fact, Plaintiff never called Defendant Fulton.

57.     Pages 205-206:

- "But two for one, 'two-forty-one,' that's how we can talk about it on the phone. It's already to the point, and I believe that it is absolutely morally allowable if they were to come and arrest one of us, for the three of us to go kick in the judge's door and the trooper's and arrest two of them. And because it's war, it doesn't even really have to be the ones that did it. Because it's just – it's war. And it's not just a war in fact, it's a war declared by them, explicitly, without mincing any words, and so I think it's absolutely morally allowable that if they arrested Ken or me, to go in and arrest two of them. If they kill one of us, we go kill two of them. If they took one of our houses, we go burn two of their houses. As – and like the philosopher John Locke says, 'It's your duty to make it an ill bargain for those that would aggress you.' And we've just

got to make it a bad bargain. Now what's morally allowable and tactically advantageous, that's what we've got to talk about.["]

58.     Plaintiff never agreed to commit violence and never accepted the plan 'two-forty-one.'

59.     <u>Page 213</u>:

- "Look, dude [Olson]. It's not like I don't know where to find you," I said. "The money – that's between me and Schaeffer. It's cool. We'll work it out. I know you need these now. Take 'em. All for the cause, right?" He looked like he'd just been pardoned from the noose.

60.     Plaintiff maintains that there is audio tape where Olson calls a handler and says, "what if they don't want these guns?" This audio tape undercuts the false claim that Plaintiff sent Olson to buy guns from Defendant Fulton.

## VI.     CAUSES OF ACTION

### <u>FIRST CAUSE OF ACTION</u>
*General Defamation*

61.     Plaintiff Schaeffer Cox repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

62.     The Defendants, together and both of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements about the Plaintiff which they knew or should have known to be false and misleading.

63.     Defendants' defamatory publications are not privileged in any way or manner.

64.     To establish general defamation, a plaintiff need only show that a person or entity (1) published a false statement; (2) about another person; (3) to a third party; and (4) the falsity of the statement caused injury to the other person.

65.     The false, defamatory and misleading publications about Plaintiff were published and the falsity of the statements caused injury to Plaintiff.

66.     Defendants knew or had reason to know that their publications were false and misleading.

67.     The false impression of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

## SECOND CAUSE OF ACTION
### *Defamation by Implication*

68.     Plaintiff Schaeffer Cox repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

69.     The Defendants, together and both of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

70.     Defendants' defamatory publications are not privileged in any way or manner.

71.     Defamation by implication is an intentional tort recognized in Texas. "[A] plaintiff can bring a claim for defamation when discrete facts, literally or substantially true, are published in such a way that they create a substantially false and defamatory impression by

omitting material facts or juxtaposing facts in a misleading way. *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 115 (Tex. 2000).

72.     Defendants, together and both of them acting in concert, jointly and severally, and individually, published false statements about Plaintiff and these statements were defamatory in that they created a false impression of Plaintiff.

73.     Defendants, together and both of them acting in concert, jointly and severally, and individually, juxtaposed a series of facts so as to imply a defamatory connection between them or, in the alternative, created a defamatory implication by omitting facts when describing the nature and sequence of events.

74.     A reasonable person would understand Defendants' statements to impart the false innuendo, which would be highly offensive to a reasonable person.

75.     Defendants, both of them, intended or endorsed the defamatory inferences that the published statements created and these false, defamatory and misleading statements were made with actual malice.

76.     The false impression of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

### THIRD CAUSE OF ACTION
#### *Defamation Per Se*

77.     Plaintiff Schaeffer Cox repeats and re-alleges all of the previous allegations of the entirety of this Compliant, with the same force and effect, as if fully set forth herein again at length.

78.     The Defendants, together and both of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully,

recklessly, grossly negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

79.     Defendants' defamatory publications are not privileged in any way or manner.

80.     A statement is defamatory per se in Texas if, among other things, it imputes injury to a plaintiff's office, business, profession, or calling; imputes a plaintiff committed a crime; imputes that a plaintiff possesses a loathsome disease; or imputes the plaintiff has engaged in sexual misconduct. *Downing v. Burns*, 348 S.W.3d 415, 424 (Tex. App. 2011).

81.     Texas defines defamation per se as words that "are so obviously harmful to the person aggrieved, that no proof of their injurious effect is necessary to make them actionable." *Alainz v. Hoyt*, 105 S.W.3d 330, 345 (Tex. App. 2003).

82.     The false, defamatory and misleading nature of Defendants' publications subjected Plaintiff to ridicule, hatred, disgust and contempt.

83.     The false, defamatory and misleading publications were made with actual malice.

84.     Defendants knew or had reason to know that their publications were false and misleading.

85.     These false impressions of Plaintiff, which Defendants created, caused irreparable harm to Plaintiff, his reputation, his business and person and his calling.

### FOURTH CAUSE OF ACTION
*Intentional Infliction of Emotional Distress*

86.     Plaintiff Schaeffer Cox repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

87.     Defendants, together and both of them acting in concert, jointly and severally, and individually, have defamed Plaintiff by knowingly, intentionally, willfully, recklessly, grossly

negligently, and/or negligently publishing statements about Plaintiff which they knew or should have known to be false and misleading.

88.    The defamatory statements described herein constitute outrageous conduct against Plaintiff.

89.    Defendants, both of them, acting individually and in concert, intended to cause Plaintiff to suffer severe emotional distress, or in the alternative, Defendants engaged in the defamatory conduct with reckless disregard of the high probability of causing Plaintiff to suffer emotional distress.

90.    A reasonable person in Plaintiff's position would consider Defendants' conduct outrageous.

91.    Plaintiff actually suffered severe emotional distress and the outrageous conduct of Defendants was a cause of the emotional distress suffered by Plaintiff.

**FIFTH CAUSE OF ACTION**
*Misappropriation of Name or Likeness Pursuant to Texas Common Law*

92.    Plaintiff Schaeffer Cox repeats and re-alleges all of the previous allegations of the entirety of this Complaint, with the same force and effect, as if fully set forth herein again at length.

93.    To prove a case of misappropriation, one must only show that someone else used a person's identity, for some advantage, which most commonly is for commercial use. *Moore v. Big Picture Co.*, 828 F.2d 270, 275 (5th Cir. 1995). It is not necessary to prove that the defendant made money off the commercial use of a plaintiff's name or likeness. *Henley v. Dillar Dept. Stores*, 46 F. Supp. 2d 587, 597 (N.D. Tex. 1999).

94.    Defendants, together and both of them acting jointly and severally, and individually, used Plaintiff's name, identity, likeness and personal information for commercial

advantage without Plaintiff's consent and even more egregiously published false and misleading material which defamed and distorted Plaintiff's name,  identity, likeness and personal information to enhance profits and severely and with malice damage him and his family.

95.    This commercial use and misappropriation of Plaintiff's name, likeness, identity and persona is a violation of Texas law.

96.    Moreover, Defendants' portrayal of the misappropriation of Plaintiff's name, likeness, and identity and persona is also false, defamatory and misleading.

97.    Defendants' misappropriation of Plaintiff's name and likeness is not newsworthy as the false, defamatory and misleading publications are not of legitimate public concern as they were created out of whole cloth to harm Plaintiff and his family.

98.    As a proximate result of Defendants' misconduct alleged herein, Plaintiff has suffered and will continue to suffer damages in an amount to be proven at trial.

**VII.    PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against each Defendant, jointly and severally, as joint tortfeasors as follows:

(a)    For general (non-economic), special (economic), actual and compensatory damages in excess of $85,000,000 USD, as well as injunctive relief;

(b)     For consequential damages in a sum reasonable to a jury;

(c)    For punitive damages in excess of $ 100,000,000 USD to punish and impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(d)    For attorneys' fees, expenses and costs of this action, and;

(e)    For such further relief as this Court deems necessary, just and proper.

**<u>DEMAND FOR TRIAL BY JURY</u>**

Plaintiff Schaeffer Cox demands a trial by jury on all counts as to all issues so triable.

**Dated**: December 20, 2018                    Respectfully submitted,

                                                */s/ Larry Klayman*
                                                Larry Klayman, Esq.
                                                Klayman Law Group, P.A.
                                                2020 Pennsylvania Ave, NW, #800
                                                Washington, DC, 20006
                                                Tel: (310) 595-0800
                                                Email: leklayman@gmail.com

                                                *Attorney for Plaintiff*